# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SHAUNTE MAURICE TERRY-JARRETT,

        Defendant-Appellant.

UNPUBLISHED
March 8, 2016

No. 324895
Kent Circuit Court
LC No. 14-000064-FC

Before: METER, P.J., and BOONSTRA and RIORDAN, JJ.

PER CURIAM.

Defendant was convicted, following a jury trial, of one count of first-degree criminal sexual conduct (CSC I), MCL 750.520b(2)(b) (victim under 13; defendant 17 or older); and one count of second-degree criminal sexual conduct (CSC II), MCL 750.520c(2)(b) (victim under 13; defendant 17 or older). The trial court sentenced defendant to 25 to 40 years' imprisonment for CSC I and to 5 to 15 years' imprisonment for CSC II, to be served concurrently, with credit for 155 days served. Defendant appeals by delayed leave granted.[1] We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises out of an incident that occurred when defendant stayed overnight at his girlfriend's, Bobbie Gray's, house in December 2013. Gray lived there with her three children, including the victim, who was 10 years old at the time of the incident. Gray testified that, on December 16, 2013, defendant asked her whether he could stay overnight, along with his five-month old Pitbull puppy, instead of going back to his mother's house. Gray gave defendant permission to stay, and they agreed that defendant would sleep upstairs in her bedroom while she slept in the basement.[2] Gray testified that the victim went to bed shortly after 9:00 p.m. and that she and defendant eventually went to bed in their respective locations.

---

[1] *People v Terry-Jarrett*, unpublished order of the Court of Appeals, entered March 31, 2015 (Docket No. 324895).

[2] Gray testified that her relationship with defendant was strained in December 2013 because defendant was controlling.

-1-

According to the victim, she went to sleep and at some point during the night "felt [defendant] putting his fingers in somewhere." She testified that she was not immediately able to see who was "doing that," but that she saw defendant when he eventually walked out of her bedroom. She further testified that she was referring to her anus, that she felt defendant's fingers "[d]igging," and that she felt his fingers go into her body. She was wearing pants, a shirt, and underwear, and defendant's fingers were under her clothing and underwear. The victim testified that, when she felt defendant's fingers digging, she moved, that he started doing the exact same thing again, that she moved again, and that defendant then left. She further testified that defendant squeezed her "booty cheeks" with his hand. While she testified that she was "halfway asleep," she clarified that she "wasn't like all the way awake, but [she] was awake." She further testified that she awoke when she started feeling something. After defendant left, the victim heard the sound of water running in the kitchen. She testified that she did not see, hear, or feel anything else that night and that she went back to sleep. She did not know whether the dog was in the room, but that she did not see or feel the dog. She did not feel anything cold or wet and her covers were not dirty, wet, or cold the next morning.

The victim testified that she wrote a note to Gray about what had happened and gave it to her the next day. She dated the note December 17th. The note stated, "When I was sleep[ing] [defendant] was squeezing my butt and putting his finger in my booty hole." The note was admitted into evidence at trial. Gray notified the police.

At approximately 8:00 p.m. to 9:00 p.m. on December 17, 2013, Amy Lowrie, a police officer who worked in the Family Services Unit of the Grand Rapids Police Department, received a call at her home to follow up on the report that had been made by Gray and the victim. Lowrie testified that she privately spoke with Gray and then privately spoke with the victim. When asked whether the victim had reported that defendant penetrated her once or twice, Lowrie initially testified, "I don't know if I specified if it was--if his fingers went inside once or twice. I asked her how many times he touched her there, and she said once." After checking her notes to refresh her memory, Lowrie further testified,

Again, I didn't ask her specifically how many times her (sic) finger went in her butt. Initially, what she had told me was that he had squeezed her butt, she had moved away. He moved his hand under her underwear again, and put his finger in her butt, and she said she moved away from him again, and he got up and left the room.

At approximately 11:40 p.m. on December 17, 2013, Sara Koster, a sexual assault nurse examiner for the YWCA, examined the victim. Koster testified that, as part of her medical examination, she asked about the victim's medical history and the complaint so that she knew what she needed to examine. According to Koster, the victim was "pretty articulate" and reported that defendant "touched her butt hole" in the middle of the night with his finger, that she moved a little bit, and that he touched her again. Koster testified that the victim indicated that defendant's finger had penetrated her anus. Koster further testified that the victim reported that defendant's finger went inside her twice. According to Koster, the victim said that she washed and cleaned herself up the next morning; Koster swabbed the victim's anus, swabbed the victim's mouth for her DNA, and collected her underwear. During her physical examination of the victim, Koster did not find an injury. Koster, who was qualified as an expert in the field of

sexual assault injury, testified that the lack of injury did not necessarily mean that an assault did not happen and that she often did not find injuries with digital penetration.

Lowrie interviewed defendant after he waived his *Miranda*[3] rights. According to Lowrie, defendant indicated that he and Gray "were kind of on the outs, kind of working [their relationship] out" and that he had a good relationship with the children, whom he thought of as his own. Lowrie testified that, when she asked defendant about what had happened the previous night, defendant said that he went to sleep upstairs with his dog, and that the dog left the room at approximately 10:30 p.m. and proceeded to soil a location in the victim's room. According to Lowrie, defendant explained that he cleaned up the mess, that he let the dog outside, that the dog came inside and got snow on the victim and her bed, and that he got a towel and wiped her down. Lowrie testified that, later in the interview, defendant "said that there were a couple spots of dirt on her that he needed to scrub to get off, and that he had to move her clothing, her pajama bottoms to get that dirt off." Lowrie further testified that she told defendant that the victim indicated something different and that defendant "admitted that his fingers, while scrubbing or tightening her pants to scrub, his fingers may have gone two to three inches inside of her-inside of the top of the opening" of her pants.

On December 19, 2013, Curtis Wassenaar, a Children's Protective Services (CPS) Investigator, visited Gray's home upon request from Lowrie. Wassenaar testified that Lowrie asked him to check for a certain towel at the home. According to Wassenaar, the entire house was very clean, and he looked through the laundry area for a dirty towel to corroborate defendant's story. Wassenaar testified that he did not find a muddy towel or one that looked dirty like it might have been used to wipe up after a dirty animal. Wassenaar further testified that he viewed the bedrooms and that there was no sign of any mess from an animal on the floors or bed. Gray testified that she was in charge of washing the sheets and bedding and that she did not wash the bedding or sheets within the next couple of days after the event. Gray further testified that she did not clean the towels, floors, or the house before CPS arrived at her house.

DNA testing on the victim's underwear did not yield any results. However, Lowrie testified that she had never had a case where she "received DNA from a touching."

At trial, the prosecution presented the evidence summarized above through the testimony of the victim, Koster, Wassenaar, Gray, and Lowrie. After the prosecution's case-in-chief, defendant testified to his version of events, substantially similar to the version he had provided to Lowrie. He also presented character witnesses who indicated that defendant was good with the children and had never been known to touch them inappropriately.

The prosecution then called Gray as a rebuttal witness. Gray testified that the whole yard was covered with snow and that she saw no places where a dog would dig up dirt. During closing arguments, the prosecution argued that the victim's testimony alone was sufficient to establish CSC I and CSC II, that victim's note explained what had happened, and that the offense

---

[3] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

occurred on a freezing cold night when there was no mud. The prosecution further argued that the victim's description was very clear and that there was no mistaking what she had felt with what she would have felt from a dog's paw or nose. The prosecution concluded by arguing that the dog story did not make sense and that the victim's description of events was consistent with the evidence. Defendant's theory of the case was that the victim's testimony was unreliable because she was a 10-year-old girl who was half-asleep. Defendant argued that the victim's testimony regarding the number of times defendant had penetrated her was inconsistent with the statements she had made to Lowrie. Defendant further argued that he was a good person, that the victim's perception was mistaken, and that his explanation remained consistent. Thus, defendant maintained that there was reasonable doubt as to whether the prosecution had proved its case.

The jury convicted defendant as described above. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that there was insufficient evidence to support his convictions. We disagree. When a defendant challenges the sufficiency of the evidence following a jury-trial conviction, this Court reviews the defendant's convictions de novo. *People v Harverson*, 291 Mich App 171, 177; 804 NW2d 757 (2010). The analysis is "whether a rational trier of fact could find that the evidence proved the essential elements of the crime beyond a reasonable doubt." *Id*. at 175. In making this determination, this Court views "the evidence in the light most favorable to the prosecution." *Id*. Further, this Court will "not interfere with the jury's assessment of the weight and credibility of witnesses or the evidence, and the elements of an offense may be established on the basis of circumstantial evidence and reasonable inferences from the evidence." *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013) (internal citations omitted).

Regarding MCL 750.520b(1)(a), "[t]he elements of CSC–I . . . are: (1) the defendant engaged in sexual penetration, (2) with a person under 13 years of age." *People v Duenaz*, 306 Mich App 85, 89, 106; 854 NW2d 531 (2014). MCL 750.520a(r) defines "[s]exual penetration" as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body. . . ." Further, "the complainant's testimony can, by itself, be sufficient to support a conviction of CSC." *People v Szalma*, 487 Mich 708, 724; 790 NW2d 662 (2010); MCL 750.520h. In addition to the requirements of MCL 750.520b, "identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

In this case, the victim was approximately 10 years old at the time of the offense. Thus, the victim was under 13 years of age. MCL 750.520b(1)(a). Next, with respect to the sexual penetration and identity elements, the victim testified that she felt defendant's fingers "digging" inside her anus. While the victim testified that she did not initially see who the perpetrator was, she testified that she saw defendant leave the room. The victim further testified that she was "[o]ne hundred percent sure" that defendant had digitally penetrated her anus and that she was sure that it was defendant who had touched her. Further, the victim wrote in a note that defendant had put his finger in her "booty hole." Moreover, defendant admitted to being in the room, and the victim's testimony was corroborated by the note and the sexual assault examiner's

testimony. While defendant offered a conflicting version of events, "[a]ll conflicts in the evidence must be resolved in favor of the prosecution and we will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008). See also *Dunigan*, 299 Mich App at 582. The victim's testimony, which need not be corroborated, *Szalma*, 487 Mich at 724; MCL 750.520h, was sufficient for a jury to conclude, beyond a reasonable doubt, that defendant had penetrated the victim's anal opening. Viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence for the jury to find that the evidence established CSC I beyond a reasonable doubt. *Harverson*, 291 Mich App at 175.

Regarding MCL 750.520c(1)(a), "[t]he elements of CSC–II are: (1) the defendant engaged in sexual contact, (2) with a person under 13 years of age." *Duenaz*, 306 Mich App at 89, 106. MCL 750.520a(q) provides that,

> "Sexual contact" includes the intentional touching of the victim's . . . or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification, done for a sexual purpose. . . .

"Intimate parts" includes a person's buttock. MCL 750.520a(f).

Here, as noted above, the victim was under 13 years of age. MCL 750.520c(1)(a). Next, with respect to the sexual contact element, the victim testified that defendant squeezed her "booty cheeks" "[l]ike you're squeezing a lemon." Further, in her note, she wrote that defendant was squeezing her butt. The victim's buttock constitutes an "intimate part." MCL 750.520a(f). Because of the nature of this touching (i.e., squeezing one's buttock) and because it occurred in conjunction with one or two digital-anal penetrations, a jury could reasonably infer that defendant acted intentionally when he squeezed the victim's buttock and could reasonably construe that this touching was done for a sexual purpose. See *Dunigan*, 299 Mich App at 582 (explaining that "the elements of an offense may be established on the basis of circumstantial evidence and reasonable inferences from the evidence"); MCL 750.520a(q). Therefore, viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence for a rational trier of fact to find the elements of CSC II proven beyond a reasonable doubt. *Harverson*, 291 Mich App at 175.

## III. PROSECUTORIAL ERROR[4]

Defendant next argues that the prosecution impermissibly vouched for the victim's credibility by stating during its rebuttal argument: "Who's better able to tell a convincing lie? An adult or a child? Which one can you pick out lying easier? An adult or a child? And how many people have questioned this child?" We disagree. Because defendant failed to object, we review this unpreserved issue of prosecutorial error for plain error affecting his substantial rights. *People v Thomas*, 260 Mich App 450, 453-454; 678 NW2d 631 (2004). Claims "of prosecutorial [error] are considered on a case-by-case basis, and the reviewing court must consider the prosecutor's remarks in context." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). "Further, [this Court] cannot find [prosecutorial] error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Id*. at 476.

"Prosecutors . . . have a duty to see that defendants receive a fair trial while attempting to convict those guilty of crimes." *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996). While the prosecution is generally afforded "great latitude to argue the evidence and all inferences relating to his theory of the case," *Thomas*, 260 Mich App at 456, it "cannot vouch for the credibility of [] witnesses to the effect that [it] has some special knowledge concerning a witness' truthfulness." *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). However, "[a] prosecutor may [] argue from the facts that a witness is credible or that the defendant or another witness is not worthy of belief." *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1997). See also *Thomas*, 260 Mich App at 455 (stating that "a prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes").

Here, the prosecution's questions were posed in the context of its rebuttal argument that the victim was credible. The prosecution argued that the victim testified that she was sure of what she felt. The prosecutor then posed the questions noted above. At trial, there was testimony that the victim had reported the incident to the police, the sexual assault examiner, and her mother, and never wavered in her identification of defendant. Further, the victim testified about the incident and was subject to defendant's cross-examination. Thus, asking the jury to consider how many people had questioned the victim was a proper argument based on the facts and reasonable inferences. *Howard*, 226 Mich App at 548. See also *Thomas*, 260 Mich App at 455-456.

Moreover, the prosecution's argument was made in response to defendant's closing argument. "Certain . . . remarks, although if standing alone could be seen as improper, do not

---

[4] As this Court recently noted in *People v Cooper*, 309 Mich App 74, 87–88; 867 NW2d 452 (2015), although the term "prosecutorial misconduct" has become a term of art often used to describe any error committed by the prosecution, claims of inadvertent error by the prosecution are "better and more fairly presented as claims of 'prosecutorial error,' with only the most extreme cases rising to the level of 'prosecutorial misconduct.' "

constitute reversible error in this case because of their responsive nature, and because any unduly prejudicial effect could have been eliminated by a curative instruction if one had been requested upon a timely objection." *Bahoda*, 448 Mich at 287 n 52 (quotation marks and citation omitted). Here, during defendant's closing argument, defendant attacked the victim's credibility by arguing that her statements were not consistent and that she was unreliable, and the prosecution's comments were in response to defendant's argument.

Finally, a curative instruction could have cured any possible prejudice resulting from the prosecution's comments. *Bennett*, 290 Mich App at 476. And, in fact, the trial court instructed the jury that the lawyers' statements and arguments were not evidence. Jurors are presumed to follow their instructions. See *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Thus, even if the prosecution's comments were improper, they do not amount to error requiring reversal. *Bahoda*, 448 Mich at 287 n 52. Defendant has not established plain error affecting his substantial rights. *Thomas*, 260 Mich App at 453-454.

## IV. MANDATORY MINIMUM SENTENCING

Next, defendant raises constitutional challenges with respect to MCL 750.520b(2)(b). He argues that the 25-year mandatory minimum sentence set forth under this provision violates the separation of powers doctrine and constitutes cruel and/or unusual punishment. We disagree. This Court reviews constitutional questions de novo. *People v Garza*, 469 Mich 431, 433; 670 NW2d 662 (2003). "Statutes are presumed to be constitutional unless their unconstitutionality is readily apparent." *People v Sands*, 261 Mich App 158, 160; 680 NW2d 500 (2004). Moreover, "[a] party challenging the constitutionality of a statute has the burden of proving its unconstitutionality." *Id*.

The Michigan Constitution's separation of powers doctrine states: "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Const 1963, art 3, § 2. Moreover, Article 4, Section 45 of the Michigan Constitution provides that "[t]he legislature may provide for indeterminate sentences as punishment for crime and for the detention and release of persons imprisoned or detained under such sentences." Const 1963, art 4, § 45. Accordingly, "the ultimate authority to provide for penalties for criminal offenses is constitutionally vested in the Legislature." *People v Hegwood*, 465 Mich 432, 436; 636 NW2d 127 (2001). See also *People v Raihala*, 199 Mich App 577, 579 n 1; 502 NW2d 755, 756 (1993) (explaining that "the power to establish sentences, including indeterminate sentences, is an exclusively legislative function"). And, "[t]he authority to impose sentences and to administer the sentencing statutes enacted by the Legislature lies with the judiciary." *Hegwood*, 465 Mich at 436-437. Therefore, a sentencing court has the responsibility "to impose a sentence, but only *within the limits* set by the Legislature." *Id*. at 437.

The Legislature thus has the constitutional authority to establish sentences, *Id*. at 436-437; *Raihala*, 199 Mich App at 579 n 1, and it used that authority to enact MCL 750.520b(2)(b). The mandatory 25-year minimum set forth under MCL 750.520b(2)(b) does not violate the separation of powers doctrine. See *Hegwood*, 465 Mich at 436-437.

With respect to cruel and/or unusual punishment, we reject defendant's arguments for the reasons set forth in *People v Benton*, 294 Mich App 191; 817 NW2d 599 (2011). See MCR 7.215(J)(1).

Affirmed.


/s/ Patrick M. Meter
/s/ Mark T. Boonstra
/s/ Michael J. Riordan